IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VLM FOOD TRADING INTERNATIONAL, INC., | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) | Case No: 12-CV-08154 |
| vs. | ) ) | Assigned Judge: Leinenweber |
| ILLINOIS TRADING CO., THE OBEE FAMILY PARTNERSHIP, LAWRENCE N. OBERMAN, individually and FJ MANAGEMENT, INC., d/b/a TAB BANK, | ) ) ) ) ) ) | Designated Magistrate Judge: Gilbert |
| Defendants. | ) | |

**DEFENDANT ILLINOIS TRADING CO., THE OBEE FAMILY PARTNERSHIP AND LAWRENCE N. OBERMAN'S RESPONSE TO PLAINTIFF'S BRIEF ON THE SCOPE OF THE PARTIES' CONTRACTS UNDER THE INTERNATIONAL CISG TREATY**

NOW COME the Defendants, Illinois Trading Co., The Obee Family Partnership, and Lawrence N. Oberman, (hereinafter "ITC" or the "Defendants") through their undersigned attorneys, and for their Response to Plaintiff's Brief regarding the Attorneys' Fee Issue, state as follows:

Introduction

Illinois Trading Company (hereinafter "ITC") purchased thousands of pounds of frozen potatoes from Plaintiff, VLM Food Trading International, Inc. (hereinafter "VLM"). ITC was in the business of purchasing wholesale amounts of produce from domestic and international suppliers, and then would resell the produce to other distributors or retailers. It is undisputed ITC purchased goods from VLM and did not pay for all the charges. The issue before the court is whether the valid contract between ITC and VLM incorporated language obligating the ITC Defendants to pay interest and attorneys' fees. The fee-shifting language was neither part of the Defendants' purchase order nor part of the Plaintiff's order confirmation.

1

Sometimes the purchase order came after the confirmation, as is seen below. VLM sent the invoice containing the attorneys' fees provision after the goods were in ITC's possession and after the risk of loss had passed to ITC. For the reasons below, based on the undisputed facts introduced at the previous trial, it is clear that the ITC Defendants are not liable for the attorneys' fees and interest claimed by VLM.

## Undisputed Facts

- VLM sold frozen produce to ITC. The outstanding principal balance of the outstanding invoices is $184,978.00. ITC does not dispute the invoice balances. (Answer to Amended Complaint, DKT #: 58, Plaintiff's Trial Exhibit 1)
- The principal office of VLM is located in Quebec, Canada. (Testimony of Witold Filemonowicz, Amended Complaint DKT #: 22)
- The principal office of ITC is in Illinois, United States of America (Amended Complaint, DKT #: 22, Testimony of Lawrence Oberman)
- There existed at the time of the transaction at issue a treaty in force in the United States named the United Nations Convention on Contracts for the International Sale of Goods. (15 U.S.C. Appendix, 52 Fed. Reg. 6262, 6264-6289 (March 2, 1987))
- Lawrence Oberman, President of ITC, never personally saw or assented to the invoices at issue in this case. (Testimony of Lawrence Oberman)
- Sweta Patel, the bookkeeper of ITC, received the invoices at issue after the delivery of the goods. (Testimony of Sweta Patel)
- Lawrence Oberman would contact VLM and establish the amount and price of goods to be purchased. Once the agreement was complete, VLM would send an order confirmation to ITC. (Testimony Wiltold Filemonowicz)
- Two of the order confirmations pertaining to the transactions at issue were sent from VLM to ITC on April 4, 2012, and six were sent on April 16, 2012. (Order Confirmations, See Attachments to Plaintiff's Brief)

- Three of the purchase orders pertaining to the transactions at issue were sent from ITC to VLM on April 4, 2012, one was sent on May 3, 2012, and five were sent on July 16, 2012. (Purchase Orders, See Attachments to Plaintiff's Brief)
- The first and only time the attorneys' fee and interest provision at issue in this case ever appeared on the documents exchanged between the parties was on the final invoice issued by VLM which were sent to the ITC Defendants after the exchange of purchase orders, order confirmations, delivery confirmations, and the delivery of the purchased produce. (Testimony of Witold Filemonowicz, Testimony of Sweta Patel, ITC Exhibits B and C)
- The last operative document in the case contained the term "ex dock" which means the risk of loss and title of the goods passed to ITC when the good were placed beside the ship at the receiving dock. *See for e.g. http://traderiskguaranty.com/terms_of_sale.aspx* (visited on May 29, 2014). (Order Confirmations and Purchase Orders, See Attachments to Plaintiff's Brief).

### Standard of Law

As stated in the undisputed facts, there exists a treaty in force named the United Nations Convention on Contracts for the International Sale of Goods (hereinafter "CISG"). If the parties do not wish CISG to apply they must affirmatively opt out. "The intent to opt out of the CISG must be set forth in the contract clearly and unequivocally." *Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F.Supp.2d 426, 430 (S.D.N.Y. 2011). CISG applies to contracts of sale of goods between parties whose places of business are in different states when the states are "contracting states." CISG Art. 1(a). The United States and Canada are "contracting states." *Chi. Prime Packers, Inc. v. Northam Food Trading Co.*, 408 F.3d 894, 897 (7th Cir. 2005). For the purposes of CISG, if a party has more than one place of business, the place of business is that which has the closest relationship

to the contract and its performance, having regard to the circumstances known to or contemplated by the parties at any time before the conclusion of the contract. CISG Art. 10. ITC's principal place of business is Illinois, United States of America, and VLM's principal place of business is Quebec, Canada, and thus CISG is the applicable law.

CISG generally does not allow attorneys fees. See *Zapata Hermanos Sucesores v. Hearthside Baking Co.*, 313 F.3d 385, 390 (7th Cir. Ill. 2002)(Posner, J.). Under CISG, when dealing with what is commonly referred to as the "battle-of-the-forms" Article 19 applies. Article 19 states in its entirety:

> (1) A reply to an offer which purports to be an acceptance but contains additions, limitations, or other modifications is a rejection of the offer and constitutes a counter-offer.
>
> (2) However, a reply to an offer which purports to be an acceptance but contains additional or different terms which do not materially alter the terms of the offer constitutes an acceptance, unless the offeror, without due delay, objects orally to the discrepancy or dispatches a notice to that effect. If he does not so object, the terms of the contract are the terms of the offer with the modifications contained in the acceptance.
>
> (3) Additional or different terms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the settlement of disputes are considered to alter the terms of the offer materially.

Courts have stated, relating to Article 19, that "[t]here are several critical differences between the law governing contract formation under the CISG and the more familiar principles of the Uniform Commercial Code. First, the CISG applies the common law concept of mirror image..." *Miami Valley Paper, LLC v. Lebbing*

*Eng'g & Consulting GmbH*, 2009 U.S. Dist. LEXIS 25201 (S.D. Ohio Mar. 26, 2009); *see also Travelers Prop. Cas. Co. of Am. v. St-Gobain Tech. Fabrics Can., Ltd.*, 474 F. Supp. 2d 1075, 1082 (D. Minn. 2007) (stating that Article 19 embodies the mirror-image rule); *see also Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 925 (N.D. Ill. 1999) (holding the same). The mirror-image rule is described as a general principle of contract law where an acceptance, in order to be effective, must exactly match the terms of an offer. *See, e.g. Miller v. Lesea Broadcasting*, 87 F.3d 224, 227 (7th Cir. 1996).

Lastly, concerning when acceptance of an offer is effective, under CISG, "[a] statement made by or other conduct of the offeree indicating assent to an offer is an acceptance. Silence or inactivity does not in itself amount to acceptance." CISG Art. 18(a).

## Argument

### A. Under CISG, VLM's Invoices Were Not Part of the Contract
#### 1. There Was Already an Express Contract Between the Parties and the Invoices Sent by VLM were not Part of the Express Contract

Under CISG, the invoices sent by VLM were not part of the contracts established between the parties. It is undisputed that neither ITC's purchase orders nor VLM's sales confirmations contained a fee-shifting provision. (See Exhibits attached to Plaintiff's Brief). It is also undisputed that VLM sent invoices after the goods were delivered to ITC. (*Id.*). The invoices were the only documents containing a-fee shifting provision. (Filemonowicz Testimony). At the heart of this case is a battle-of-the-forms issue. The Seventh Circuit Court of Appeals recently noted in this very case that the CISG embodies the "mirror-image-rule." *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 2014 WL 1389094, 14 (7th Cir. 2014). Article 19 states that any reply purported to be an acceptance to an offer that contains additional or different terms constitutes a rejection and a counter-offer.

5

Art. 19(1). Article 19(2) provides that nonmaterial additional terms in an acceptance become part of the contract, but defines "materiality" to include provisions affecting party's liability, like fee-shifting provisions. Art. 19(2), (3). Accordingly, the fee-shifting provision on the invoices could not become part of the contract because it is a material term ITC never accepted. Article 18 states that silence or inactivity does not in itself amount to acceptance, and ITC did not affirmatively assent to such terms. Therefore, the fee-shifting provision is not incorporated into the contract under the CISG. Because the fee shifting and interest provisions are not part of the deal between ITC and VLM this Court may not award attorneys' fees.

The relevant transaction between ITC and VLM bears a close resemblance to the offer-counter-offer situation discussed by a Pennsylvania Court in *Roser Techs., Inc. v. Carl Schreiber GmbH*, 2013 WL 4852314 (W.D. Pa. Sept. 10, 2013). In *Roser*, CSN Metals ("CSN") first provided a price quotation to Roser Technologies, Inc. ("RTI") which included language detailing CSN's specific payment target language. *Roser Techs., Inc.* 2013 WL 2842314 at 1. Next, RTI sent back a purchase order "per CSN quote..." including RTI's own standard conditions of sale. *Id.* CSN then sent RTI an order confirmation reiterating their own specific payment language. *Id.* The court found that under CISG the terms of the contract are those embodied in the last offer (or counter-offer) made prior to a contract being formed. *Id.* at 5. The specific payment target terms were material under CISG Article 19(3) because they related to payment for the goods. *Id.* at 10. Additionally, RTI accepted CSN's payment target terms stated in the email confirmation counter-offer when the goods were received. *Id.* at 11. Thus, a valid contract under CISG was formed, and the terms of the contract were those set forth in CSN's order confirmation, including the terms relating to advance payment. *Id.* In short, the purchase order sent by RTI was an offer, the CSN email confirmation was a counter-offer which was ultimately accepted and created a valid contract under CISG when RTI received the goods. *Id.* Put another way, what *Roser* confirms is that the last document which arrives before the goods are accepted is the document which controls the transaction.

6

The scenario in *Roser* is strikingly similar to the current undisputed facts. The purchase orders sent by ITC constituted offers, the VLM confirmations were counter-offers under Article 19(1) because they contained different material terms. CISG Art. 19(1), (3). Or, the purchase orders, when received after the confirmations, constitute the last document in the transaction. Either way, the last remaining document is the counter-offer. This counter-offer was accepted when ITC received the goods, creating a complete and binding contract. As noted in the undisputed facts, the terms of the transaction were "ex dock" which means that title to the goods and risk of loss passed to ITC when the goods were laid on the dock. Title and risk of loss therefore passed to ITC before the invoice was sent. Thus, a fully formed contract for each shipment was established and completed before ITC received VLM's invoices. Therefore, the trailing invoices were not part of the express contract between the parties, and are unenforceable against ITC. As such, the ITC Defendants cannot be liable for collection costs and attorneys' fees because that provision was never part of the contract between the parties.

2. New Material Terms Cannot be Added Into a Contract Through Course of Dealing

    i. The Plaintiff's Case law is Distinguishable and Inapplicable

The CISG is clear in Article 19(3) that additional terms relating to the extent of one party's liability to the other are considered to alter the terms of the offer materially. CISG Art. 19(3). Article 19(1) is clear that any reply purported to be an acceptance to an offer that contains additional or different terms constitutes a rejection and a counter-offer. CISG Art. 19(1). Article 18(1) is clear that silence or inactivity does not in itself amount acceptance. CISG Art. 18(1). The fee-shifting provision in VLM's invoices alters the extent of ITC's liability, and is thus a material alteration. From Defendant's research, no United States court or scholarly commentator has discussed whether a material term can be added to a contract through course of dealing under Article 9(2), as Defendant suggests. Defendant relies on *St. Paul Guardian Ins. Co. v. Neuromed Sys. & Support GmbH*, but the

facts distinguish it from the current situation. 2002 WL 465312 (S.D.N.Y. March 26, 2002). *St. Paul Guardian* is distinguishable because the court incorporated the international commercial terms ("INCOTERMS") definition of the term "CIF" that was found in the valid contract. *St. Paul Guardian Ins. Co.*, 2002 WL 465312 at 4. INCOTERMS definitions have the force of law as trade custom under German law, the relevant law stated in the contract. *Id.* "CIF" was already a term in the contract that was affirmatively accepted, and the court incorporated INCOTERMS under Article 9(2) only to clear up a latent ambiguity in the definition of the term. *Id.*

In the current case, ITC never affirmatively assented to the fee-shifting provision, as the party in *St. Paul Guardian* assented to "CIF". The incorporation of the fee-shifting provision term would not be used only to establish a uniform definition of a contractual term as in *St. Paul Guardian*, but would significantly shift liability onto ITC. The current case is also distinguishable because the *St. Paul Guardian* court was applying German law. There exists no authority that states a material term can be added to a pre-existing valid contract through course of dealing under Article 9(2). For this court to rule in such a way would be directly contrary to the "mirror-image rule" of Article 19, which is central to the CISG. The crux of the "mirror-image rule" is that an acceptance, in order to be effective, must exactly match the terms of an offer. *Miller,* 87 F.3d 224, 227 (7th Cir. 1996). ITC never affirmatively assented to include a fee-shifting provision to any shipment, and VLM's "unilateral attempt to add terms through an invoice did not modify the parties' contract." *Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d 452, 457 (D. Del., 2008). It would be contrary to the CISG and all case law interpreting Article 19 to decide that a trailing invoice including a material term shifting liability of the parties could be incorporated into an already formed contract.

### ii. Articles 9(1) and 9(2) do not Apply

VLM argues that because ITC paid attorneys' fees to another party, Endico and Simplot, they too are entitled. This argument is meritless. ITC has never paid VLM attorneys fees. Article 9(1) only applies to practices which are established

8

between the parties themselves. See CISG 9(1)[1]. How ITC handled other litigation cannot bind them. If ITC wishes to pay a premium to settle another lawsuit and fight this one that is in their discretion. It is undisputed that ITC never paid a past due VLM invoice which contained the fee shifting provision or settled a lawsuit with VLM regarding the attorney fee provision. Because there has been no course of dealing between ITC and VLM on the issue of paying for attorneys' fees Article 9(1) is of no use to the Plaintiff.

Before the Court is the contract between VLM and ITC, not ITC and Endico or Simplot. Both Endico and Simplot shipped domestically, not internationally. This Court does not know, nor can it know, the details in the transactions between ITC and its other suppliers as those suppliers did not testify. What happened between ITC and Endico or Simplot is not before the Court and therefore should not be considered.

Lastly, VLM relies exclusively on invoices concerning domestic transactions when it comes to industry practice. Every invoice and other document introduced by VLM dealt with a domestic transaction. Article 9(2) covers only international trade practices. *See footnote 1*. VLM has introduced no evidence that in international trade the attorney fee provision is standard. CISG itself clearly does not generally allow attorney fees. *See Zapata Hermanos Sucesores v. Hearthside Baking Co.*, 313 F.3d 385, 388 (7th Cir. Ill. 2002)(Posner, J.). In order for Article 9(2) to apply VLM would have to introduce evidence showing international transactions but they have failed to do so. Therefore, VLM's reliance on the invoices between ITC and Simplot and Endico is misplaced because CISG only applies to international transactions. This Court has never explicitly found that it is the trade practice in international

---

[1] Article 9 states in its entirety:

9(1) – The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves.

9(2) – The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in *__international__* trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned (emphasis added).

trade to include attorney fee provisions and, therefore, the trade practice of fee shifting cannot be read into the contract under Article 9(2).

### B.  There was an Overarching Oral Agreement Between the Parties

The contract and shipments from VLM to ITC were further controlled by an overarching oral agreement between the two parties.  During the initial trial, Mr. Filemonowicz testified that VLM would send confirmation to ITC "[w]henever the contract is done.  When it's scheduled for shipment and delivery, it's sent." (Filemonowicz Testimony, Transcript pg. 78).  Confirmation for all nine relevant transactions was sent from VLM to ITC on two different dates, April 4, 2012 and April 16, 2012 (See exhibits attached to Plaintiff's Brief).  Based on trial testimony, these confirmations were sent after the oral contracts were set which delineated the price and amount of goods bought by ITC from VLM.  (Filemonowicz Testimony, Transcript pg. 78).  At no point during the oral negotiations was a fee-shifting provision discussed between the parties.  (Filemonowicz Testimony, Transcript pg. 78).  Under CISG's Article 11, a contract of sale does not need to be evidenced by writing or subject to any other requirement as to form.  CISG Art. 11. The treaty later states that a contract is concluded at the moment when an acceptance of an offer becomes effective.  CISG Art. 23.

This situation is similar to the facts in *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528 (9th Cir. 2003).  In the 9th Circuit case, Chateau des Charmes called Sabate and agreed to buy a certain number of wine corks at a certain price. *Id.* at 529.  Chateau des Charmes placed a second phone call order later in the year under the same terms.  *Id.*  The goods were shipped in eleven shipments from Sabate to Chateau des Charmes.  *Id.*  For each shipment, Sabate sent an invoice to Chateau des Charmes containing a forum selection clause.  *Id.* Sometimes the invoice arrived before the shipment, sometimes after, and sometimes concurrently.  *Id.*  The 9th Circuit Court held the forum selection clause sent in the invoice was not valid because the oral agreement between the parties as to the kind

10

of cork, quantity, and price was sufficient to create complete and binding contracts under the CISG. *Id.* at 531. The oral contracts did not include a forum selection clause, and "nothing in the Convention suggests that the failure to object to a party's unilateral attempt to alter materially the terms of an otherwise valid agreement is an 'agreement.'" *Id.* This ruling has been affirmed by a Delaware court in case involving a similar fact pattern. *See Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d 452 (D. Del., 2008).

Based on these ruling and the testimony, a valid oral contract between ITC and VLM were created prior to the email confirmations sent on April 4, 2012 and April 16, 2012. The case at bar is almost identical to *Charmes* and *Solae*. Just as in those cases the goods contracted for were shipped in different shipments after the conclusion of the oral contract. Here, there were nine shipments between July 31, 2012 and September 24, 2012 at a price and amount previously agreed upon. Exactly as in *Charmes* and *Solae* the oral contract did not include a fee-shifting provision, and VLM's attempt to unilaterally alter material terms in the invoice is not valid. This Court, bound as it is by Article 7 of the treaty, must apply the rules laid down in *Charmes* and *Solae* uniformly to the transaction at issue and find that the overarching oral contract controls and that VLM's attempt to unilaterally add a term to the contract is unenforceable.

## Conclusion

The facts of the case are simple. ITC called VLM and asked for their quote on a price and amount of frozen produce which VLM provided. ITC accepted the terms and VLM confirmed that acceptance by sending the April 4, 2012 and April 16, 2012 confirmations. After the contract terms were confirmed ITC sent purchase orders to VLM which indicated when and where the produce should be delivered. After the goods were delivered, VLM sent a trailing invoice with terms that radically changed the deal negotiated between the parties.

VLM's unilateral attempt to change the terms between the parties fails for several reasons. First, the invoice is a counter-offer which was never accepted by ITC. The 7th Circuit briefly commented on this argument in the appeal and seemed to approve it. *See VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 2014 WL 1389094, 13, 14. Second, a material term cannot be added to a contract unilaterally by sheer force of course of dealing. The Plaintiff's authority on this matter is clearly distinguishable and is in conflict with the terms of the CISG. Article 19 is plain and must be applied. Lastly, even if the invoices were not counter-offers or even if Article 9 could trump Article 19, the terms of the parties' contract were fixed at the time of the April 2 and April 16 confirmations. Just as in *Charmes* and *Solae*, there existed an oral contract whose terms did not include the fee shifting provision.

ITC has paid VLM for the value of the goods that VLM delivered. This case should be over. Because VLM's attempts to unilaterally add a material term to the contract between the parties is void for the reasons stated above, this Court must rule in favor of the Defendants on the issue of attorneys' fees.

    Respectfully Submitted,
    FOR ILLINOIS TRADING CO.,
    OBEE FAMILY PARTNERSHIP, and
    LAWRENCE OBERMAN

    By: /s/ George L. Grumley
        One of their Attorneys

George L. Grumley
Richard C. Carey
GRUMLEY, KAMIN & ROSIC, LLC
Three First National Plaza
70 W. Madison, Suite 2100
Chicago, IL 60602
312-994-9004 (o) * 312-994-0541 (f)